**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

_____
                               :    Civil Action No. 14-7399 (FLW)

WAYNE B. MITTON,           :

                                :    **OPINION**

                Plaintiff,     :

                                :

    v.                           :

                                :

CAROLYN W. COLVIN,      :

Acting Commissioner of Social Security,  :

                                :

                Defendant.   :

_____ :

**WOLFSON, United States District Judge**:

      Wayne B. Mitton ("Mitton" or "Plaintiff"), appeals from the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Defendant") denying Plaintiff disability benefits and supplemental social security income under Title II of the Social Security Act (the "Act"). After reviewing the Administrative Record, the Court finds that the Administrative Law Judge's ("ALJ") opinion was based on substantial evidence and, accordingly, affirms the decision.

**I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

      Plaintiff was born on August 6, 1962, and was 46 years old on the allege disability onset date of June 6, 2008. A.R. 50, 53 (hereinafter "A.R."). Plaintiff's education terminated in the 10th grade, and he has not obtained his G.E.D. A.R. 54. Plaintiff lives with his sister and her husband. A.R. 70. Plaintiff has one minor child with whom he does not reside. _See_ A.R. 440. Prior to his alleged disability, Plaintiff worked as a laborer, landscaper, machinist, maintenance worker, stock worker, and sweeper truck driver, and most recently, as a maintenance worker. A.R. 270.

      In April 2009, Plaintiff applied for social security disability insurance benefits and supplemental security income, alleging disability beginning on June 6, 2008. A.R. 223-29; 230-

32.  Plaintiff's claim was denied on August 6, 2009, A.R. 105-116, and again upon reconsideration on September 10, 2009.  A.R. 120-25.  On September 21, 2009, Plaintiff requested a hearing, A.R. 126, which was held on September 7, 2010, before ALJ Brian H. Ferrie.  A.R. 35-46.  ALJ Ferrie determined that Plaintiff was not disabled and denied his claims for disability insurance benefits and supplemental income. A.R. 82-93.  On September 6, 2012, Administrative Appeal Judges Christopher R. Field and Louann Y. Igaski ordered that Plaintiff's matter be remanded for further consideration because the ALJ made conflicting findings regarding the severity of Plaintiff's impairments and Plaintiff's exertional limitations, and failed to indicate the weight given to the opinion of the state agency's consulting psychiatrist.  A.R. 99-101.

A second hearing was held on March 20, 2013, before ALJ Daniel N. Shellhamer.  A.R. 47-77.  Plaintiff, who was represented by Robert Ryan, Esq., at the second hearing, appeared and testified, A.R. 53-71, and testimony was taken from Bruce Sillasi, a vocational expert, A.R. 71-75.[1]  On April 22, 2013, the ALJ issued a decision denying disability and supplemental income. A.R. 11-34.  Plaintiff requested review by the Appeals Council, which was denied on September 24, 2014.  A.R. 1-4.  On November 26, 2014, Plaintiff filed the present appeal against Defendant.

A.    **Review of the Medical Evidence**

Plaintiff's medical records begin in March of 2006.  On March 23, 2006, Plaintiff was admitted to Florida Hospital Flagler, complaining of right wrist pain from having fallen off a building from "about 10 feet up landing on his outstretched right dominant hand, striking the right side of his chest wall."  A.R. 360.  Plaintiff's x-rays indicated that his right wrist demonstrated a comminuted intraarticular displaced right distal radius fracture with significant disruption of the

---

[1] The ALJ's written opinion misidentifies the vocational expert as Louis P. Szollosy.  A.R. 11.

joint surface.  A.R. 360.  Plaintiff also underwent a CAT scan of his neck and thorax, which demonstrated a 5% pneumothorax.  A.R. 362-63.  The next day, a repeat x-ray show an "increased pneumothorax to about 30 to 40%."  A.R. 357; A.R. 364-65.  On March 24, 2006, Plaintiff underwent a right closed tube thoracostomy performed by John Walsh, M.D., A.R. 357, and an open reduction internal fixation to repair the Colles fracture to his right arm, performed by Dennis Alter, M.D. A.R. 358-59; A.R. 367.  Thereafter, Plaintiff's pneumothorax was monitored from March 24, 2006 to March 29, 2006.  A.R. 265-66, 368-73.

On June 6, 2008, Plaintiff was admitted to the Community Medical Center for depression.  A.R. 374-75; *see also* A.R. 389-92.  Plaintiff had called a crisis hotline for help and indicated he had thought of hurting himself.  AR 374.  Plaintiff was voluntarily admitted based on "increasing depression, using marijuana, suicidal ideation with a plan to overdose on pills, and what turned out to be a major gambling addiction."  A.R. 396-397; A.R. 383.  Plaintiff was discharged on June 12, 2008.  A.R. 396.

On July 7, 2008, Plaintiff was admitted for treatment to Ocean Mental Health Services, Inc., for a bio-psychosocial assessment ("Assessment").  A.R. 433-47.  The reason given for Plaintiff's referral was depression, and his symptoms were that he "report[ed] overwhelming sadness, lack of motivation and difficulty sleeping at night, negative thinking, withdrawing, [and] lack of interests."  A.R. 433.  For Plaintiff's history, the Assessment stated:

> Client reports that about 2 years ago his ex wanted child support for his daughter who lives in Florida.  Client reports financial stressors to trigger depression along with not seeing his daughter.  Client reports to feel depressed for past two years and did not get treatment.  Client also reports falling at work 3 years ago and injuring his arm and collapsing his lung which triggered depression.  Client also reports that after his accident he broke up with his ex.

A.R. 433.  Plaintiff also reported an "excessive gambling problem" and reported "to be in gambling anonymous and attends meetings weekly."  A.R. 436.  For Plaintiff's work history, the Assessment

3

recorded "Client reports to have worked in construction and as a handyman.  Client reports since

his accident 3 years ago, he has been unable to work due to fear of falling and damage to his arm."

A.R. 439.  The Assessment also noted that Plaintiff "reports to enjoy bowling and fishing," but

that he has "difficulty focusing on his interests."  A.R. 441.  The Assessment concluded with a

preliminary treatment plan for Plaintiff to attend individual therapy with Ocean Mental Health

Services every other week with the goals of "learning and utilizing coping skills to reduce negative

thoughts and depression," along with  undergoing a psychiatric evaluation within the month.  A.R.

446.

The medical record indicates that Plaintiff underwent therapy on nine occasions at Ocean

Mental Health Services, Inc., which was recorded in the form of "psychiatric evaluations" and

"psychiatric progress notes."  The first four reports for these evaluations state, in relevant part:

- August 13, 2008:  "Plaintiff admits that he was feeling hopeless and had thoughts of suicide. . . . Now, mood has improved somewhat.  Admits to having problems [with] concentration . . . since childhood" and "denie[d] SI/HI" (i.e., Suicidal Ideation /Homicidal Ideation ("SI/HI")).  A.R. 430-32.

- October 18, 2008:  A change in medication due to stomach issues reported, Plaintiff reported "racing thoughts," but there was "no grandiosity, no cravings for gambling" and Plaintiff "ha[d] been sleeping at night."  A.R. 448-49.  Plaintiff again denied SI/HI.  A.R. 448.

- January 9, 2009:  Plaintiff stopped using medication due to "too many dreams"; Plaintiff "remains depressed – feels unmotivated.  Has a wish to work again, but fails to follow through."  A.R. 450-51.  Plaintiff again denied SI/HI.  A.R. 550.

- April 10, 2009:  Plaintiff reported "a gambling spree in A.C. – spent $9,000 . .  now has legal issues related to this . . . mood now is anxious."  A.R. 452-53.  Plaintiff again denied SI/HI.  A.R. 452.

On July 21, 3009, Plaintiff underwent a Psychiatric review by Dr. Ina Weitzman.  A.R.

416-29.  Dr. Weitzman found Plaintiff suffered from affective disorder and substance addiction

disorder, but also found that his impairments were "not severe."  A.R. 416.  Dr. Weitzman did not

4

note the presence of suicidal thoughts.  A.R. 419.  Dr. Weitzman found only a "mild" degree of

limitation for maintaining social functioning and maintaining concentration, persistence, or pace,

and no limitation on activities for daily living.  A.R. 426.

On June 25, 2009, Plaintiff was evaluated by Dr. William D. Coffey on behalf of Disability

Determination Services.  AR 410-15.  Dr. Coffey noted that Plaintiff engaged in the following

"daily activities":

> [Plaintiff] has some friends who he goes fishing or bicycle riding.  A typical day is
> spent at home.  He makes his bed, cleans his room, and takes care of the house.  He
> cleans the house, cuts the lawn, cleans the pool, takes the garbage out, and "all the
> basic stuff that needs to be done around the house."  Interests include fishing,
> bowling, and bicycle riding.  He enjoys the movies, dinner, and going to Great
> Adventure with his family. . . . He does not belong to any social organizations.
> [Plaintiff] has a driver's license and is able to drive [and] does not have any
> problems with self-care or grooming.

A.R. 412.  Dr. Coffey also noted there "was no evidence of suicidal or homicidal thinking."  A.R.

412.  Dr. Coffey provided the following "assessment of severity":

> Mr. Mitton has adequate understanding, memory, and concentration.  Mr. Mitton
> has adequate mental pace and persistence.  Social interaction is adequate.  Mr.
> Mitton's condition is considered to be 100% mental.  However, it is not clear if Mr.
> Mitton's condition will last the next 12 months.  His symptoms do not appear to be
> so severe that it would interfere with his ability to engage in employment.  When
> asked if there was any further information, Mr. Mitton responded, "Just issues with
> my daughter."  Mr. Mitton did not have any questions of the examiner.

A.R. 413.  Dr. Coffey concluded his examination by recommending that "Mr. Mitton should

continue with the present course of treatment." A.R. 413.

Plaintiff had his fifth evaluation at Ocean Mental Health Services on August 17, 2009,

which noted, in relevant part, that Plaintiff "has been feeling better on the decreased dose [of

medication.  No more vivid dreams.  Sleeping at Night.  Mood has improved."  A.R. 454-55.

Plaintiff again denied SI/HI.  A.R. 454.

On September 8, 2009, Plaintiff underwent a Psychiatric Review by Dr. Michael Britton. A.R. 456-73. Dr. Britton determined that an RFC assessment was necessary, but only checked off that Plaintiff suffered from affective disorders, and not substance addiction disorders. A.R. 456. Dr. Britton did not note the presence of suicidal thoughts. A.R. 459. Dr. Britton found "moderate" limitations for activities for daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. A.R. 466.

On that same day, Dr. Britton performed an RFC assessment which found Plaintiff was "moderately limited" in the following categories:

- The ability to understand and remember detailed instructions;
- The ability to carry out detailed instructions;
- The ability to maintain attention and concentration for extended periods;
- The ability to work in coordination with or proximity to others without being distracted by them;
- The ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- The ability to interact appropriately with the general public;
- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

A.R. 470-71. For all other categories, Dr. Britton found Plaintiff to "not [be] significantly limited." A.R. 470-71. Dr. Britton concluded that Plaintiff was "doing better," but "the treatment required indicates that claimant's impairment is more than 'not severe.' Nonetheless cl[aimant] can adapt to all functional requirements for simple routine tasks." A.R. 472.

The medical records indicate that Plaintiff had four more evaluations at Ocean Mental Health Services; the reports for these evaluations state, in relevant part:

- September 25, 2009:  Plaintiff reported that "he's starting to feel impulsive, anxious, overwhelmed from financial stress being sued by the casino, problems with daughter . . . sleep is intact." A.R. 480-81. Plaintiff again denied SI/HI. A.R. 480.

- November 13, 2009:  Plaintiff reported "that moods have improved . . . sleeps well at night.  Appetite has increased, there are no psychotic symptoms," but "continues to make bad decisions, feels impulsive, spends too much money," and felt anger against his ex-wife.  A.R. 478-79.  Plaintiff again denied SI/HI.  A.R. 478.

- February 24, 2010:  Plaintiff reported "that moods have been stable," but had complaint about medications.  A.R. 476-77.  Plaintiff again denied SI/HI.  A.R. 476.

- May 21, 2010:  Plaintiff reported that he does not always take medication and continues to engage in gambling, but expressed a desire to "get back on track."  A.R. 474-75.  Plaintiff again denied SI/HI.  A.R. 474.

The medical records also include "Medication Management" forms from Ocean Medical Health Services, which note that Plaintiff denied SI/HI on April 25, 2011, A.R. 521-22; September 6, 2011, A.R. 519-20; August 15, 2011, A.R. 517-18; January 6, 2012, A.R. 515-16; and March 30, 2012, A.R. 513-14.  In Ocean Mental Health Service's August 20, 2010 and December 13, 2010 annual updates for Plaintiff, his "present behavior" was marked as not suicidal. A.R. 527-28; A.R. 525-26.

On October 31, 2012, Plaintiff underwent a MRI on his cervical spine, performed by Joel Kravitz, MD.  A.R. 550-51.  Dr. Kravtiz observed:

Clinical Data:  Neck Pain

Through the cervical spine there is loss of disc signal on T2 weighted images.  There is minimal disc space narrowing at the C5-6 level.  The vertebral body heights are preserved.  The alignment of the cervical spine is anatomic.

At the C4-5 level, there is a posterior and to the right disc protrusion/osteophyte complex indenting the right lateral recess without evidence of cord compression or foraminal stenosis.

At C5-6 level there is a large posterior and to the left disc extrusion/ostephyte complex abutting the left ventral cervical cord, effacement of the left lateral recess and narrowing of the left neural foramen.  There is no definite cervical cord compression.

At C6-7 level is a small central disc protrusion indenting the ventral thecal sac without cord compression of foraminal stenosis.

The bone marrow demonstrates normal signal.  The cervical cord has a normal appearance without evidence of mass lesions or myelomalcia.

A.R. 550.

On January 2, 2013, Plaintiff was examined by H. Moffitt, M.D., on behalf of the State of New Jersey Division of Family Development.[2]  A.R. 552-53.  Dr. Moffitt diagnosed Plaintiff with bipolar disorder (but not depression).  A.R. 552.  Dr. Moffitt indicated that Plaintiff cannot work, nor could he participate part-time in a WFNJ work activity, and indicated the duration of Plaintiff's incapacity would run from January 2, 2013 to March 10, 2014.  A.R. 553.

## B.    Review of Disability Determinations

On April 16, 2009, Plaintiff applied for social security disability insurance benefits and supplemental income, alleging disability beginning on June 6, 2008.  A.R. 223-29; 230-32. On August 6, 2009, the Social Security Administration denied Plaintiff's claim for disability benefits and supplemental security income based on Plaintiff's being bipolar, finding that Plaintiff's "condition should not affect [Plaintiff's] ability to work."  A.R. 105.  On September 9, 2009, the Social Security Administration denied Plaintiff's request for reconsideration, finding that Plaintiff indicated that his condition has not changed or worsened since the initial determination and considered:

- You have . . . continued to experience occasional episodes of depression. However, there is no permanent mental disorder which would prevent you from doing normal daily activities.

- The evidence shows no other condition which significantly limits your ability to work.

---

[2] On that same date, Dr. Moffett also completed an OMHS annual update form for Plaintiff, and checked the box indicating that Plaintiff's present behavior was suicidal. A.R. 524.

- We realize your condition prevents you from doing your usually work as a [landscaper] which you did for six (6) [years]; however it does not prevent you from doing other types of work requiring less stressful effort.

A.R. 123.

### C.   Review of Testimonial Record.

#### 1.   Plaintiff's Testimony at the First Hearing.

The first hearing in this matter was held on September 7, 2010, before ALJ Brian H. Ferrie. A.R. 35-46.  Plaintiff testified that he was alleging disability beginning on June 6, 2008, and that he had been surviving on "general assistance."  A.R. 38.  Plaintiff described his disability as:

> A lot of focus and concentration, sadness, depression.  I feel just, you know – that's why I went, I had an episode.  Sometimes I feel like I'm going to have some episodes sometimes, so I try to relax when I feel that coming on, you know.

A.R. 39.   Plaintiff further explained that he sometimes is "in and out" which makes his daily routine difficult, but when that occurs, he takes a "little rest" that is "maybe a half hour" in duration.  A.R. 40.  Plaintiff also described having anxiety from "[t]hinking about stuff" or when he is "in an uncomfortable situation."  A.R. 41.

Plaintiff described his hospital admission for depression in 2006, explaining that he had an "episode" that doctors "tried to find out what does that mean" and he explained that "that means I just called it quits.  I just didn't want to do it no more[.]"  A.R. 43.  When questioned what that meant, Plaintiff stated that it meant that he did not want to live:  "I had enough.  I felt like I was at the end of my ropes, you know."  A.R. 43.  Plaintiff stated he had not been hospitalized for depression since 2008, A.R. 39, that he takes the medications for his mental state, A.R. 39, and that he is receiving medical treatment "every three months, two or three months" at Ocean Mental Health Services.  A.R. 38.

Plaintiff stated that he lives with his sister and described his responsibilities around the house as his "daily routine":  "Like I make the bed, I help maintain her house, because she works full time so I take care of things.  She, you know -- I cut the lawn, take care of the pool, load the dishwasher, you know."  A.R.  40.  Plaintiff further stated that he "slowed down now, I just stay in, like inside and don't do much right now, but yeah, I still do all the work around the house, take care of the house and stuff."  A.R. 45.  He denied continuing to use marijuana, A.R. 41, and, although he stated he had taken money from his assistance to gamble, he denied "hitting the casinos."  A.R. 44.

Plaintiff testified that prior to 2008 he worked as a "handyman or maintenance" or "landscaping work," and stated that he could not return to that work because he broke his arm in 2006, and that he still has "a lot of pain" in his arm.  A.R. 41-42.  Plaintiff also stated that he could not return to work because when he is "trying to do stuff [he] feel[s] that concentration and focus is not, is not -- [he's] not really paying attention to what [he's] doing."  A.R. 42.

### 2.    Plaintiff's Testimony at the Second Hearing.

The second hearing in this matter was held on March 20, 2013, before ALJ Daniel N. Shellhamer.  A.R. 47-77.

Plaintiff testified that he is 5' 8" tall and weighs 170 pounds.  A.R. 53.  Plaintiff testified that he had gained 25-30 pounds due to an increased appetite from his medication.  A.R. 65. Plaintiff stated that he lives with his sister and brother-in-law, both of whom he gets along with, A.R. 70, and has a driver's license, and has no trouble driving (other than a lack of vehicle).  A.R. 53.  Plaintiff testified that he finished the 10th grade and that he did not obtain his G.E.D.  A.R. 54. Plaintiff described his typical day as beginning at seven or eight o'clock a.m., and that he would:

> Go for a coffee and -- get myself a coffee, make my bed, see if my sister needs a hand around the house or -- like, I say, in the summer, cut the lawn; maybe in the

winter, give her a hand with the -- a lot of just house chores because I'm home all day, you know, willing to help my sister with things that she needs.

A.R. 68.  Plaintiff testified that he travels by bicycle "from place to place," and described being able to ride his bike to a store 1/2 mile away from his house and back.  A.R. 53-54, 68.  Plaintiff stated that he does not engage in any "real social activities," does not belong to any clubs or organizations, does not attend religious services or go "anyplace on a regular basis," and has no hobbies.  A.R. 68-69.  However, Plaintiff also stated that he tries to get out at least every day to do something besides going to the store.  A.R. 70.  Plaintiff testified that he used to go fishing and bowling, but estimated that he had not done either activity in "a long time, at least three or four years or so."  A.R. 69.  Plaintiff stated that the primary reason for not engaging in those hobbies was financial, but also stated that "I just haven't been myself, haven't been feeling well."  A.R. 69.  Plaintiff described his gambling problem as "better," A.R. 68, and stated that he stopped using marijuana.  A.R. 69.

When questioned as to his physical problems that limit his ability to work, Plaintiff stated that "somewhat of my arm, my right arm, and some stiffness in the whole -- probably like arthritis, feeling where your bones are stiff[.]"  A.R. 57.   Plaintiff described a "constant" pain in his wrist that "comes and goes" more with colder weather.  A.R. 57; *see also* A.R. 58 (describing "constant arthritis type pain").  Plaintiff stated that he is left-handed.  A.R. 57.  When asked for an example of "something that's too strenuous . . . for you to do with [his] right hand," Plaintiff responded that "working, maybe, with wrenches or, or maybe swinging a hammer or something . . . because of the weights of, of what you're holding or . . . both, the weight and the movement."  A.R. 59.  However, when questioned whether he has any difficulty performing fine manipulations with his right hand, Plaintiff responded "[n]ot really."  A.R. 59.

11

Plaintiff also stated that in October of 2012, he "suddenly" began having "circulation problems" in his neck and arm, which caused his left arm to fall limp.  A.R. 60.  Plaintiff stated he underwent an MRI and X-Rays which revealed he had "problems with the C5/C6 and herniated disk and stuff."  A.R. 60.  Plaintiff stated that, prior to these circulation problems, he only felt a "little stiffness or pain, but nothing, nothing dramatic."  A.R. 60-61.  Plaintiff stated that he was currently in pain, and that "every once in a while [he has] a little bit of [a] tingling feeling in [his] left arm.  It comes and goes.  It's not as frequent as it was when it first happened."  A.R. 61.  Although Plaintiff was prescribed physical therapy three times a week, Plaintiff testified that he only went to three days of therapy because it was "a[n] inconvenience" due to not having a car, and only being able to ride a bike.  A.R. 61.  Instead, Plaintiff testified that he has been doing home exercises for his neck.  A.R. 61

With respect to his mental problem, Plaintiff testified that he had been diagnosed with bipolar disorder and depression in 2008, and which continue to be problems for him.  A.R. 62-63.  Plaintiff described how his depression affects him on a day-to-day basis:

> [S]leepiness, a lot of tiredness, focus, concentration, paying attention, you know, stuff that's -- your mind wanders just constantly in circles.  You don't hear -- really hear voices, but just stuff that – it's hard to cope with.  You, you, you spend five or ten minutes on something, and you feel like you want to go right back to bed[.]

A.R. 63.  Plaintiff testified that he had a short attention span, and stated that he could not watch an hour-long TV show, but that he could watch sports programs.  A.R. 62-63.  Plaintiff stated that his memory is "okay."  A.R. 64.  When asked by counsel to give an example of something that he might try to do at home that he has trouble concentrating on and completing, Plaintiff stated:

> Just day-to-day things that I you do, I guess.  Like, I don't do much.  I -- other than sleeping, and I try to do things around the house for my sister or, you know -- it could be cutting the grass, taking out the garbage, making my bed, your daily things that I can do is okay, but anything other than that, it gets -- I don't feel like I can

12

keep doing it for a long period of time.  I just get -- would get -- be getting depressed[.]

A.R. 64.

Plaintiff testified that he had been having thoughts of hurting himself "with the recent things that have been going on, with the trying to get my Social Security" and "just things that are building up."  A.R. 64-65.  Plaintiff also testified that he "[s]ometimes" has trouble sleeping at night due to bad dreams, and that he takes 2-3 half-hour naps every day. A.R. 65.  Plaintiff stated that he has been seeing a therapist and a psychiatrist as an outpatient.  A.R. 66.

### 3.    Testimony of the Vocational Expert at the Second Hearing.

Mr. Bruce Sillasi, an impartial vocational expert, also testified at the hearing.  During Mr. Sillasi's testimony, the ALJ posed the following hypothetical:

> Hypothetically, if I had an individual [of] similar age, education, past work experience as Mr. Mitton, and if I were to find that the individual would be limited to no more than the exertional demands, say, of light work; would have a restriction in, in only occasional grasping and holding larger objects with the non-dominant hand; would be restricted to only understanding and remembering simple, routine instructions; carrying out repetitive tasks; dealing with minor or few work changes, work changes in a routine work setting; and making simple work-related decisions using common sense. . . . with just limitations I gave you, are there any jobs that spring to mind that the hypothetical individual might be able to do?

A.R. 73-74.  Mr. Stillasi responded:

> Given that hypothetical, the unskilled occupations that one could perform would be that of . . . a mail clerk, which is classified as unskilled, light exertion.  It does require -- he, he would be able to perform that occupation even though he only has occasional grasping and holding of a non-dominant hand, because the other upper extremity would be requiring frequent, frequent use.

A.R. 74.   Mr. Stillasi estimated that there were approximately 2,000 mail clerk positions regionally, and 115,000 positions nationally.  A.R. 74.  Mr. Stillasi also identified the position of inspector/hand packager, for which he estimated that 3,500 such position existed regionally, and 400,000 nationally.  A.R. 74-75.  Mr. Stillasi acknowledged that the position of inspector/hand

packager also required "frequent" handling and fingering, but testified that "given the hypothetical, in my professional opinion, would not preclude that position."  A.R. 75.  Mr. Stillasi also testified that if an individual had difficulty focusing on a task for up to two hours, that would preclude "preclude competitive employment . . . on a sustained basis."  A.R.  75.

### D.    ALJ's Findings

ALJ Shellhamer issued a written decision on April 22, 2013.  A.R. 11-34. The ALJ began by finding that Plaintiff met the insured status requirement of the Social Security Act to remain insured through December 31, 2010.  A.R. 12, 14.  Next, the ALJ applied the standard five-step process to determine if Plaintiff had satisfied his burden of establishing disability.

First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 6, 2008, the alleged onset date.  A.R. 14.

Second, the ALJ found that Plaintiff had the following severe impairments: "status post-surgery of radius fracture of the non-dominant right upper extremity, depressive disorder, bipolar disorder, and substance abuse."  A.R. 14-15.  The ALJ also specifically found that Plaintiff's gambling addiction and alleged problems with his cervical spine were not supported by substantial credible evidence and did not constitute severe impairments.  A.R. 15.

Third, the ALJ found that Plaintiff does not have an impairment, or a combination of impairments, that meets or medically equals the severity of one of the listed impairments under the Act that would qualify for disability benefits.  A.R. 15-20.  In this step, the ALJ considered sections 1.02 (major dysfunction of a joint), 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), 12.04 (affective disorders), and 12.09 (substance addiction disorders) of the Schedule of Listed Impairments, 20 C.F.R. Pt. 404, Subpt. P., App. 1.  With respect to the latter two sections, the ALJ specifically examined whether the "paragraph B" criteria

14

were satisfied, finding that Plaintiff suffered only a "mild restriction" for activities of daily living, A.R. 16-17; "mild difficulties" for social functioning, A.R. 17; "moderate difficulties" for concentration, persistence, or pace, A.R. 17-18; and that Plaintiff has experienced "one to two episodes of decompensation, each of extended duration." A.R. 19-20. Accordingly, the ALJ found that the paragraph B criteria were "not satisfied" because Plaintiff's mental impairment did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration." A.R. 20. The ALJ also considered the "paragraph C" criteria for these latter two scheduled listings and found those criteria unsatisfied as well. A.R. 20.

Fourth, the ALJ found that Plaintiff had the residual functional capacity to perform the exertional demands of light work as defined in 20 C.F.R. §§ 404.1567(b); 416.967(b), A.R. 20-32, with the exception that:

> [C]laimant may only occasionally grasp and hold larger objects with his non-dominant [right] hand, can only understand and remember simple, routine instructions and carry out repetitive tasks, can only deal with minor or few work changes in a routine work setting, and can make simple work-related decisions using common sense.

A.R. 20. In reaching this RFC determination, the ALJ extensively reviewed Plaintiff's statements concerning his physical and emotional conditions, as well as his medical records concerning both his alleged physical and mental impairments. *See* A.R. 20-32.

The ALJ found the additional exertional limitation for Plaintiff's right wrist was warranted based on Plaintiff's own testimony that he is able to perform light work, but could not perform "strenuous" work with his right wrist:

> Regarding his physical condition, particularly his wrist, the claimant stated that he has no difficulty picking things up and holding them, as long as it is not too strenuous, like using hammers and wrenches. The claimant testified that he has no problem with fine manipulation or tying his shoes. Further, the wide array of

> regular physical activities, some of which are strenuous, confirms that the claimant is capable, at the very least, of performing light exertional work, on a regular, sustained basis, with only occasionally grasping and holding larder objects with his non-dominant hand, as per the residual functional capacity set forth by the undersigned.  As noted, the claimant makes his bed, performs extensive household chores, loads the dishwasher, maintains the house, takes out the garbage, mows the lawn during the summer, and takes care of the pool.  He is capable of driving a car. He travels extensively by bicycle. . . .

A.R. 23.  Based on this RFC, the ALJ determined that "the requirements of the claimant's work exceed his residual functional capacity."  A.R. 32.

Fifth, the ALJ found that, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity,[3] "there are jobs that exist in significant numbers in the national economy that the claimant can perform."  A.R. 32-33.  In reaching this determination, the ALJ relied on the testimony of a vocational expert to determine whether Plaintiff's "limitation erode[d] the unskilled light occupational base":

> The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as mail clerk, DOT No. 209.687-026, which is unskilled light exertional work, 115,000 jobs nationally, 2,000 regionally; and inspector hand packager, DOT No. 559.687-074, which is unskilled light exertional work, 400,000 jobs nationally, 3,500 regionally.  The vocational expert testified, based on his training and experience, that although these jobs require frequent handling, they would not be precluded by the limitation of only occasional grasping and holding of larger objects with the non-dominant hand, because the individual is capable of frequent manipulative tasks with the dominant hand (hearing record).  This statement of the vocational expert is found to be credible, because it is well-reasoned, the vocational expert is unbiased, and the vocational expert has extensive experience and is very well-qualified in the vocational field (Ex. 23B and hearing record).

A.R. 33.

---

[3] The ALJ observed that (1) Plaintiff was 45 years old on the alleged disability onset date, but that his age category subsequently changed to "closely approaching advanced age," under 20 C.F.R. §§ 404.1563; 416.963, (2) Plaintiff has "a limited education and is able to communicate English"; and (3) transferability of job skills was not material to the determination of disability because using the Medical-Vocational Rules as a framework supported a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills.  A.R. 32.

Accordingly, the ALJ concluded that "the claimant has not been under a disability, as defined in the Social Security Act, from June 6, 2008, through the date of this decision." A.R. 33-34.

## II.   STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching,

carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428.

Finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production then shifts to the Commissioner to show, at step five, that the

"claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled.  *Id.*

## III.   PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff makes two arguments on appeal as to why the ALJ's disability determinations were unsupported by substantial credible evidence.  First, Plaintiff argues that the vocational expert's ("VE") testimony conflicted with the Dictionary of Occupational Titles ("DOT") because the jobs the VE identified require "frequent" fingering and handling, but the ALJ's hypothetical requested the VE to identify jobs that an individual with the limitation of only being able to "occasionally" finger and handle with his non-dominant hand could perform.  Second, Plaintiff argues the ALJ's RFC determination at Step 4 is not supported by substantial credible evidence. The Court shall address each argument in turn.

### A.   The VE's Testimony Did Not Conflict with the DOT.

Plaintiff argues that the ALJ erred in his analysis of Step 5 by relying on the testimony of the VE that was in conflict with the DOT because the hypothetical posed to the VE by the ALJ was for jobs that an individual with the limitation of only being able to "occasionally" finger and handle with his non-dominant hand, and that the VE's responsive examples both required "frequent" fingering and handling.  Plaintiff is incorrect.

The two jobs identified by the VE as responsive to the hypothetical posed by the ALJ, and referenced in the ALJ's decision – mail clerk, DOT No. 209.687-026, and inspector hand packager, DOT No. 559.687-074 – both require "frequent" handling and fingering.  However, the DOT does

not require full bilateral dexterity to satisfy handling and fingering requirements. *See, e.g.*, *Musgrave v. Astrue*, No. CIV-09-1276-D, 2010 U.S. Dist. LEXIS 100231, at *15 (W.D. Okla. Aug. 23, 2010) ("[T]he DOT does not address whether bilateral fingering and handling are required in the job of counter clerk photo finishing, and thus, no actual conflict between the vocational expert's testimony and the DOT has been shown."), *adopted by*, 2010 U.S. Dist. LEXIS 99875 (W.D. Okla. Sept. 21, 2010); *Diehl v. Barnhart*, 357 F. Supp. 2d 804, 822 (E.D. Pa. 2005) (finding "no material conflict" existed between VE evidence and DOT because "[t]he fact that a job requires reaching, handling, or fingering does not necessarily mean that Plaintiff is incapable of performing that job since in some cases he may be able to satisfy the requirements of the job by reaching, handling, or fingering with his left hand with occasional assistance from his right hand."). Moreover, there is no medical evidence in the record that Plaintiff cannot use his non-dominant hand at all – based on Plaintiff's testimony of his daily chores and routines (*i.e.*, mowing the lawn, riding a bicycle, etc.), the ALJ determined that Plaintiff had sufficient dexterity in his dominant hand, and a slightly more restricted dexterity in his non-dominant hand (because Plaintiff testified he could not engage in "strenuous" activities with his right wrist), such that he could perform the jobs identified by the VE.

Indeed, the VE in this case specifically referenced the hypothetical limitation presented by the ALJ – a restriction of occasional use of the non-dominant hand – and opined that, in his professional opinion, that hypothetical individual could perform both jobs with that restriction. A.R. 73-74; *see Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) ("The DOT does not contain any requirement of bilateral fingering ability or dexterity, and the vocational expert specifically testified that the jobs of cashier and ticket seller could be performed with the use of only one arm and hand."). Accordingly, the Court finds no conflict between the VE's testimony and the DOT,

21

and the ALJ correctly relied on that testimony to determine that jobs existed in significant numbers in the national economy that Plaintiff can perform.

### B.   The ALJ's Residual Functional Capacity Determination is Supported by Substantial Credible Evidence.

Second, Plaintiff argues that the ALJ's RFC determination at Step 4 – that Plaintiff can perform light, unskilled work – was unsupported by substantial credible evidence.  Specifically, Plaintiff argues that the ALJ (1) provided no reason for finding that Plaintiff could "occasionally" use his right arm (rather than frequently use it, or not use it at all), and (2) improperly found that Plaintiff had the concentration, persistence, and pace to perform unskilled work based on Plaintiff's demeanor testifying at the hearing and his ability to ride a bicycle.  The Court will address each argument in turn.

"'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a).

> In making a residual functional capacity determination, the ALJ must consider all evidence before him.  Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.  In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.

*Burnett*, 220 F.3d at 121 (internal quotation marks and citations omitted).

With respect to Plaintiff's challenge to the exertional limitation in the RFC determination, this Court finds that the ALJ's RFC is supported by substantial credible evidence.  The ALJ considered both Plaintiff's testimony and his medical records in reaching his determination that Plaintiff could perform light work, with an additional limitation that his right hand only be used occasionally.

First, the ALJ recounted Plaintiff's own testimony of being able to perform light work, albeit with a limitation on using his wrist when he performs "strenuous" work:

> Regarding his physical condition, particular his wrist, the claimant stated that he has no difficulty picking things up and holding them, as long as it is not too strenuous, like using hammers and wrenches.  The claimant testified that he has no problem with fine manipulation or tying his shoes.  Further, the wide array of regular physical activities, some of which are strenuous, confirms that the claimant is capable, at the very least, of performing light exertional work, on a regular, sustained basis, with only occasionally grasping and holding larder objects with his non-dominant hand, as per the residual functional capacity set forth by the undersigned.  As noted, the claimant makes his bed, performs extensive household chores, loads the dishwasher, maintains the house, takes out the garbage, mows the lawn during the summer, and takes care of the pool.  He is capable of driving a car. He travels extensively by bicycle. . . .

A.R. 23.

The ALJ also reviewed statements Plaintiff made relating to his wrist that were recorded in his medical records, noting that when he was admitted for depression in 2008:  "with regard to his operated [right] wrist, the claimant denied any aches or pains."  A.R. 24; *see also* A.R. 25 (reviewing records from 2008 hospitalization and noting that Plaintiff merely "stated that he had at least 'some degree of disability' due to his arm injury.")

The ALJ also reviewed psychiatric notes from Ocean Medical Health Services, in which Plaintiff reported that he was "unemployed rather than disabled, and stated that he has been unable to work because he fears falling and hurting his arm, rather than asserting that his arm is not functioning properly as he stated at the hearings."  A.R. 25.  Further, the ALJ also considered Plaintiff's statement to Dr. Coffey that "in 2007 and 2008 he did some 'yard work and odds and ends.'"  A.R. 29.  The ALJ concluded that Plaintiff could perform, "at the very least, light exertional work tasks on a regular sustained basis."  A.R. 24, 29.

In sum, the ALJ determined that Plaintiff could physically perform light work, and that – based on Plaintiff's own testimony – his right wrist had an additional limitation, but was not totally

disabled.  Moreover, Plaintiff offers no evidence to contradict his own testimony.  *Clark v. Astrue*, No. 09-933, 2010 U.S. Dist. LEXIS 33641, at *41-42 (W.D. Pa. Apr. 6, 2010) ("If [claimant] believed herself to have limitations in excess of those identified . . . the onus was on her to present evidence from her treating physicians establishing the existence of those limitations."). Accordingly, the Court finds that the ALJ's exertional limitation determination is adequately supported by substantial credible evidence.

With respect to Plaintiff's challenge to the non-exertional limitation in the RFC determination, this Court finds that the ALJ's RFC is supported by substantial credible evidence as well.

As a preliminary matter, Plaintiff confusingly challenges the non-exertional limitation in the RFC (Step 4), but he cites only to the ALJ's consideration of evidence and analysis of his mental impairments at Step 3 to determine whether Plaintiff had an impairment or combination of impairments that significantly limited his physical or mental ability to do basic work activities. The ALJ expressly noted that his analysis of Plaintiff's mental limitations at Step 3 was "*not* a residual functional capacity assessment but [is] used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation," and that "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in Paragraph B of the adult mental disorders listings in 12.00 of the Listing of impairments."  A.R. 20 (emphasis added).

Based on the portions of the ALJ decision complained of by Plaintiff, it appears he is arguing that the ALJ erred in relying upon Plaintiff's ability to ride a bicycle, and his calm demeanor while testifying at the administrative hearing, to find that Plaintiff has the concentration,

24

persistence, and pace to perform unskilled work.  This argument misstates the ALJ's analysis.  At Step 4 of the sequential evaluation, the ALJ determined that:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effective of these symptoms are not entirely credible for the reasons explained in this decision.

A.R. 21.  The ALJ found that a review of Plaintiff's "testimony and statements" and "medical evidence" did not demonstrate that his "ability to function is so impaired as to render him totally disabled or unable to perform any substantial gainful activity."  A.R. 21.  In reaching the conclusion that Plaintiff can perform unskilled work – the non-exertional RFC challenged by Plaintiff – the ALJ relied on Plaintiff's own testimony regarding his routine of daily household chores, A.R. 22; Plaintiff's statements in his function reports, A.R. 22-23; and the extensive medical evidence of Plaintiff's hospitalization in 2008, therapy for his mental impairments, and psychiatric evaluations, A.R. 24-32.  Among this evidence, the ALJ relied on Plaintiff's ability to "drive and extensively ride his bicycle" as the basis for weighing the credibility of Plaintiff's "allegations as to the extent of his impairments and limitations, since driving and bicycle riding require good abilities for maintaining attention, concentration, persistence and pace."  A.R. 22.  The ALJ went on to "reasonably infer[]" that Plaintiff "would not drive or ride his bicycle extensively, and place himself or the general public in danger, if his ability to maintain attention, concentrate, persistence, and pace in tasks was significantly affected, which in turn would cause the claimant to be a danger if he drove or rode his bicycle with such limitations."  A.R. 22-23.

The ALJ is entitled to weigh the credibility of evidence, and reject testimony he finds not credible, provided that he "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence."  *See Burnett*, 220 F.3d at 121; *Cotter v. Harris*, 642 F.2d 700, 705

(3d Cir. 1981).  On appeal, Plaintiff only provides nothing but his own allegation of total disability and "a rudimentary, common law person's understanding of" his mental impairments, Pl. Reply Br. at 2, to argue that the ALJ erred in rejecting his assertion that he is unable to perform unskilled work.   The ALJ, however, rendered his determination based on Plaintiff's own testimony at the hearing and the medical evidence presented, and further provided reasonable explanations for his finding Plaintiff's assertions concerning his concentration, persistence, and pace were not credible. Accordingly, the Court finds that the ALJ's non-exertional limitation determination is adequately supported by substantial credible evidence.

## IV.    CONCLUSION

For the reasons set forth above, I find that the ALJ's decision was supported by substantial evidence in the record. Accordingly, the ALJ's decision is affirmed. An appropriate Order shall follow.

Dated: December 15, 2015

/s/ The Honorable Freda L. Wolfson

United States District Judge